: *Robert Lyle* v. *Isaac Clason, and Isaac Clason* v. *Robert and John Lyle.*

THESE were cross-suits, brought under the following circumstances :

On the first of *September*, 1793, *Robert Lyle* engaged with *Clason* to go to *Europe* as his agent, and transact his business at a salary of 150*l.* per annum, *New-York* currency, besides his expenses. In consequence of this arrangement, *Robert Lyle* embarked on board a vessel of *Clason's,* called the *Hare,* destined to *Hamburgh,* with a cargo of sugar and coffee. In an account made out by *Robert Lyle* against *Clason,* he charges his salary for six months, at 42*l.* 3*s.* 4*d.* ending in *March,* 1794. No evidence appeared that *Clason* either then, or at any time after, discharged *Lyle* from his service ; and in an account rendered by him to *Robert Lyle,* he gives *Lyle* credit for one year's salary at the above rate.

H h

In *March*, 1794, at which time *John Lyle* was employed in the Loan-Office of the *United States*, *Robert* was in *Paris*, and while there, entered into a contract with the *French* government, ostensibly in his own name, but in fact, for the house, and through the influence of *Delard, Swan and Co.* of *Paris*, for the delivery of from ten to fifteen hundred tons of pot and pearl-ashes, *in any port of France*, at 53*l*. sterling per ton, (payable as soon as delivered) two-fifths in bills on *Hamburgh*, and three-fifths in louis d'ors, with a licence of exportation for the specie.

On the nineteenth of the same month, *Robert Lyle* wrote to *Clason* an account of the contract, urging him to embark in it, and inclosing a more particular letter from *Swan*, offering *Clason* an interest in the contract, by the terms of which the profits were to be thus divided : one-third to *Delard, Swan and Co.* and two-thirds to *Clason*, giving to *Lyle* for the use of his name, a fifth of the whole ; one-third of which, was to be paid by *Delard, Swan and Co.* the remaining two-thirds by *Clason*. *Robert Lyle*, in his letter, cautions *Clason* against being too explicit in what he may write, for fear of capture, and advises him to let the language he might use, accord with the appearance the business might be obliged to assume.

In consequence of this letter, and without any other information of the contract, than what the letter of *Robert Lyle* contained, *Clason*, in *July*, 1794, dispatched to *France*, under the command of one *Gideon Gardner*, a vessel named the *Joseph*, laden with pot and pearl-ashes, giving to *Gardner* at the same time, the following letter of instructions :

" Capt. *Gideon Gardner,*

" *New-York, 26th July,* 1794.

" Dear Sir,

" You will please to take charge of the ship *Joseph,* " and proceed as fast as possible to *France.* I shall " not confine you to *any one port,* but by all means, " endeavour to get into *any port, the first that you* " *can make,* which, if you are fortunate enough in " arriving safe, you will immediately apply to one of " our *American* Consuls for instructions, respecting " the customs of the place, and there make sale of " your cargo to the best advantage for my account ; " *perhaps you will be able to make a sale of the whole,* " *to the republic of France,* at a good profit, by taking " part in brandy ; which, if so, and the brandy should " appear to you of a good quality, and at such a price " as you might judge would answer to bring here, " you will do it ; if not, you will endeavour to sell " for cash, and if times should appear favourable in " *England,* you will remit the greater part of your " avails to Messrs. *Bird, Savage and Bird,* mer- " chants in *London ;* and if you don't find freight from " *France,* or any other article that will answer, you " may run to any port in *England,* and either load " there with salt, or get freight, whichsoever you " may judge will be most to my interest. However, " it is impossible for me to give you any positive in- " structions, from the precariousness of the times ; " much will depend on your good judgment on your " arrival. I think *likely you may see or hear from Ro-* " *bert Lyle ; if so, he will give you very essential as-*

" sistance in your negotiating your business in that
" country.

>" I am, Sir, &c.
>" (Signed)                    ISAAC CLASON."

*Gardner* set sail with the *Joseph*, and, on the 4th
*September*, 1794, arrived at *Cherbourg*. From thence,
he addressed himself to *Delard, Swan & Co.* and on
the 9th of *October*, 1794, wrote them thus:

>" *Cherbourg*, 9th *October*, 1794.
>" Messrs. *Delard, Swan & Co.*
>    " Gentlemen,
>    " I received yours this morning, of the 15th *Ven-*
>" *demaire*.   I wrote you yesterday, and inclosed you
>" a receipt from the *garde Magazin* for my cargo.
>" The cost of my cargo, I sent you in my letter,
>" yours now mentions of receiving; but, agreeable
>" to your request, you have it here inclosed.——
>" The pot and pearl-ashes, as per invoice, cost
>" £ 12,012 3 0                       £12,012 3 0
>    " One barrel ashes delivered more
>" than the invoice, which I received
>" as a barrel of beef, average 350
>" wt. at 46*s*.                                  8 1
>                                      ——————
>    " *New-York* currency,   £12,020 4 0
>" Charges here—paid charterage,  1000
>            " Do. weighing,      25
>                        ———— 1,025

>    " I know of no other charges here ; if any to be
>" paid to the commission of commerce, you will
>" please to charge them in the account.   If you re-

" collect, you took off the foots of the invoice, when
" I was at *Paris*, on the letter I left with you. The
" letter I wrote you about my owner you mention of
" having found it, and say it was inclosed in yours I
" received this morning, but I expect you omitted it,
" as it has not come to hand. Please to forward it as
" soon as possible, as it may make some alteration in
" my affairs. You mention of the uncertainty of re-
" ceiving cash or bills for any article from America.
" I would thank you in your last to me, to mention
" whether WE may place full confidence in their pay-
" ing me in good bills, or cash, AGREEABLE TO THE
" CONTRACT FOR THE QUANTITY OF ASHES SPECI-
" FIED, AS THAT WAS MY PARTICULAR ORDERS
" FROM Mr. CLASON. You have once mentioned
" it, but your two last letters leave it doubtful in my
" mind. I would thank you to acquaint Mr. *Lyle* of
" my proceedings as soon as the bills are obtained. I
" am only waiting for the bills, and beg you to make
" all dispatch in your power, and am yours.

" (Signed) GIDEON GARDNER."

On the seventh of *December* following, *Gardner*
addressed a letter to *Lyle* in these terms :

" *Cherbourg, 7th December,* 1794.
" DEAR SIR,
" I received yours of the 15th *November.* I ar-
" rived here 4th *September,* and *proceeded to*
" *Paris and delivered the cargo* ON THE CONTRACT
" OF 53; *and as Mr. C. was in advance for the whole,*
" *I arranged it for D. S. to have one-third, agreeable*
" *to the account annexed.* THEY ARE TO SETTLE

" WITH YOU FOR ONE-THIRD OF WHAT YOU ARE
" ENTITLED TO, AND Mr. C. TO SETTLE WITH
" YOU TWO-THIRDS, after delivering the cargo, and
" the receipt presented for payment.    There was a
" suspension of all payments in bills or money.  I re-
" turned to *Paris*, and, after a long and tedious deten-
" tion, I obtained bills on *Hamburgh, though not at the
" rate agreed for*.    They are at 90 days and the ex-
" change 185 livres for 100 marks banco; which bills
" I forwarded by post, to *Lubert* and *Dumas*, who, I
" understood, did your business there.   I was fear-
" ful you were in *England* by what I had heard, or I
" would have sent them to you.   My orders to them
" were, to negotiate the bills, and remit the money to
" *B. S. & B. London*, on Mr. *C's*. account, except
" there should be an appearance of war.    In that case
" they are to consult you.   *(I was cautioned by Mr.*
" *C. in respect to that.)*   I presented a petition for
" demurrage, &c. to the amount of £1250 sterl. which
" has passed two or three offices, which I wish you to
" press hard for.   I sent two bills by different posts,
" and wrote you.   I have two-thirds of a cargo of
" prize salt on freight; about £400 sterl. freight.  It
" is almost half on board, and am taking in the rest ;
" shall sail in a few days for *New-York*, and expect
" to return as fast as possible with the remainder of
" the contract.   *Swan* is gone to *America*.   Mr. *C.*
" shipped by captain *S. Armour* about two hundred
" tons—Major *Conolly* is the supercargo.   They
" have sold to individuals for specie.  I have wrote
" *B. S. & B.* since I sent the bills, and also informed
" them of this other cargo.

*Account of my Cargo.*

To the cost in *America*,
as per invoice,   12,020  4  0
Insurance, 5 per cent.  601  0  2

                                    12,621  4  2
Interest on do. from
1st July, to 1st
*December* at 6 pr.
cent.                          315  10  7
My Commission,          1,000
Freight, 1,200 sterl.  2,133  6  8

*New-York* currency, 16,070  1  5

Is, sterl.                   9,039  8  4
     3,200  7  10
     1,600  3  10 ——4,800  11  8

                                    13,840
Paper money expenses on the cargo, was 2,795 livres, 2-3 1-3.

*By Sales*

Of two hundred and
sixty-one tons and
286 lb. at  £53
per cwt.          13,840

The amount of bills
I remitted is, M.
Banco,          158,786  10

To this, *Delard & Co.* added, " Approved this account ; the assignats to be settled at ten, and *Clason* obliged to satisfy *Lyle* for two-thirds of his commission, or gratification.
         (Signed)
               *D. S. & Co.*"

In the month of *March*, 1801, *Robert Lyle* arrived in *New-York*.   *Clason* refusing to pay the two-thirds of the fifth of the emoluments arising from the contract with the *French* republic, in *April*, 1801, *Robert* brought the present action against him.   Shortly after which, *Clason* arrested *Robert* and *John Lyle* in the cross-suit, for a very considerable sum of money.

In *December*, 1801, both causes were, by order of court, referred.

On the 10th of *March* following, the attorney for *Robert Lyle* submitted the following proposition to the attorney of *Clason*.

" As the suit instituted by Mr. *Clason* against Mr.
" *Lyle*, does not include any claim for damages, aris-
" ing from the misconduct of the latter, and more par-
" ticularly, for damages like those claimed on the bu-
" siness of the *Hare*, it would be proper (lest these
" should be made the subject of a future suit, on the
" part of Mr. *Clason*, on the ground of an objection
" to the report on the part of Mr. *Lyle*) that all claims
" and controversies of this nature be included in the
" submission already made, which, in a legal point of
" view, extends only to the subject matter in differ-
" ence, in the particular suits referred.

 " (Signed) THOS. L. OGDEN, for *Lyles*."

To this the attorney of *Clason*, subjoined the fol-
lowing memorandum :

 " It is understood that the demands for damages
" above mentioned, and all claims and demands on
" both sides, founded on contract, express or implied,
" are submitted." To this addition, the attornies of
both parties added their signatures, and the consent
of the litigants themselves were given in these words,
" We agree to the above, and that all the accounts,
" *as already exhibited*, shall be reported on by the re-
" ferees in these causes.
    (Signed)
      " I. CLASON,
      " ROBT. LYLE."

On the 30th *December*, the deposition of *Gardner*
was taken in behalf of *Clason ;* in which, among
other things, *Gardner* swore, that his letter of instruc-

tions contained the *only orders* he had from *Clason* ; that *Delard & Co.* informed him of *their* contract with the *French* government, and he contracted with them ; that *they* informed him the contract was in *Lyle's* name, he being a neuter ; that *they* informed him *Lyle* was to have a *gratification*, but what it was he, *Gardner, never knew* ; thinking, and being fully assured in his own mind, that it would apply to the benefit of *Clason, Lyle* being his salaried agent, which consideration induced him, *Gardner,* to consent to *Clason's* being accountable to *Lyle* for two-thirds of the said gratification, which he expected would be paid by the salary at which *Lyle* was retained.

On the 22d of *June*, the referees made their report in both causes, and in each, reported in favour of the defendants.

On the 20th of *July*, the report in the cross-suit by *Clason*, was, on motion in court, duly confirmed. Immediately after which, on the 23d of the same month, *Robert Lyle*, in order to set aside the report in favour of *Clason*, made an affidavit, which stated, that the suit instituted by him in *April*, 1801, was to recover money had and received by *Clason* to the deponent's use ; that it was referred, and at the meeting of the referees, the deponent, as the basis of his claim, did prove, and make appear, &c. (mentioning the contract and circumstances, and letters detailed in the beginning of the case) that the net profits on the sales made by *Gardner* under the contract, were £4,800 11 8 sterling; that the fifth, to which the deponent was entitled, in pursuance of the engagements made

with him, was £960 2 4, of which, by an original account of *Delard, Swan & Co.* produced to the referees, it was proved *Delard, Swan & Co.* had paid their one-third, according to the agreement with *Gardner ;* but no payment was shown, or pretended to have been made of the other two-thirds of the fifth, nor was there before the referees, any set-off, or counter claim established against the defendant ; that the deposition of *Gardner* (before shortly stated) was shown to the referees, and *Gardner* himself personally examined : that he *then* testified *he was, previously to his departure from America,* with the said cargo, per the ship called the *Joseph, made acquainted with the existence of the said contract,* BY THE DEFEND-ANT, *and with the terms or price therein stipulated ;* that he did not consider himself bound by the instructions of *the defendant, to deliver his cargo under the contract,* nor restricted from doing so, but at liberty to act according to his discretion ; that his motives for inquiring from *Delard & Co.* respecting the reliance to be placed on punctual payment, and also for alleging this to be done at the desire of the defendant, was to hold out the idea of future shipments, and *so* insure the payment of what had been delivered, but not settled for; that it was made to appear without any denial, that the defendant had only received his two-thirds of the profit on the contract aforesaid ; that the report had, notwithstanding, been made in favour of the defendant, under an idea that *Gardner* had no authority to bind *Clason* to the payment of any thing to the deponent; and that *Clason* had altered the deposition of *Gardner,* after it was made, and before presented to the referees, without communicating the alteration to them.

On the 6th of *October*, 1802, *Clason* made an affi- davit to vacate the report in favour of the *Lyles*, in which he set forth the instituting the two suits ; their being referred ; the reports made in favour of the respective defendants, and that they were duly filed, on the first day of *July* term last past, so that judgment would, according to the usual course of the court, be absolute, the then term ; that the reports, according to his information and belief, were drawn up by agreement between the counsel in both suits, that each should draw the report in favour of his own client ; that the deponent's attorney was, on the 23d of *July* last, served with a copy of an affidavit, accompanied with a notice of moving upon it to set aside the report in favour of the deponent ; that the matters contained in the affidavit, went to the merits of the case, respecting which, on account of sickness in the deponent's family, and absence from *New-York*, the deponent could not make any explanations to his counsel ; that he acquiesced in the report against himself, from a conviction nothing could be obtained from *Lyle*, and, therefore, no report could operate more favourably to the interest of the defendant ; that the known inability of *Lyle* to pay, was one reason why the referees were less particular in examining the deponent's claims against him, than they otherwise would have been, deeming it unimportant ; that the two reports were made, and intended by the referees *as set-offs the one against the other*, and to this end, they instructed counsel to prepare them accordingly ; that, among other charges against *Lyle*, the deponent gave in evidence, an account rendered by *Lyle*, in which he acknowledged having in his hands a balance of 244,246 livres in assignats,

amounting, at the then rate of exchange, to 4,477 dollars, and that assignats were then never kept on hand, but always converted into property, to avoid depreciation; that since the account so rendered, the dej onent never had any further money or mer- cantile transactions with the *Lyles*, and that *Lyle* nei- ther accounted for, nor made any set-off against the said assignats, but the same were totally unaccounted for; that the deponent, as soon as the sickness of his family permitted, consulted respecting measures to be taken about opposing the motion, to set aside the report in his favour, but there was not time enough left in the term to do it; that but for the application of *Lyle* to set aside the report in favour of the de- fendant, he should never have applied to set aside that in favour of *Lyle*, for the insolvency of *Lyle* made it of no consequence.

The notice of motion with which this affidavit was accompanied, was repeated on the 7th of *January*, 1803.

To oppose this, *Robert Lyle* made, on the 14th of *January*, 1803, an affidavit, stating, that he, and his brother *John*, the other defendant, acted, in the year 1795, as agents for *Clason*, in which capacity they had received various large sums of money, the whole of which had been faithfully accounted for; that the suit against *Clason* was for money due individually to the defendant, on another concern, and for damages for libellous letters and slanders published against him by *Clason*; that he and his brother were arrested, as before mentioned, and the two causes referred; that in the suit against the deponent and his brother, (the

declaration on which was for goods sold with the usual money counts only) *Clason* produced an account with charges, against the deponent and his brother, for breach of orders and neglect of duty, to a very large amount; that on asking for some evidence, by which it might appear, those charges were included in the submission, the agreement of the 10th *March*, 1802, was produced; that the same was intended merely to extend the powers of the referees to claims of the nature of those mentioned in, and warranted by, the declarations to which the deponent had confined himself; that his, and his brother's faithful agency, and due accounting for all sums of money, were fully proved; that in the cross-suit against the deponent and his brother, the referees made their report on a conviction nothing was due to *Clason*, and not from any regard to the deponent's insolvency or circumstances, as he was, by the referees themselves, personally informed; that the deponent proved, to the satisfaction of the referees, that the value of the assignats mentioned in *Clason's* affidavit, was, *at the time specified*, only £278 2 9, and *not* $4,477; that they were *not* then usually converted into property, but held by many persons in hopes of their rising, and that the said assignats *were not only not made use of by the deponent, or kept in his hands,* BUT HAD, FROM THE TIME OF THEIR FIRST RECEPTION, BEEN PAID OVER BY HIM TO THE CORRESPONDENTS OF CLASON, LUBBERT, FRERES & ELIS, OF BORDEAUX, BY WHOM THEY WERE CONVERTED INTO SPECIE, FOR THE USE OF CLASON, AND ACCOUNTED FOR WITH GARDNER, WHEN ACTING AS CLASON'S AGENT; that, so far from the acquiescence of

*Clason* in the report against him, for the reasons he had assigned, he had, after it was made, purchased protested bills, on which the deponent's name was as an indorsor, and had commenced suits against the deponent upon them, in order, as he believed, to create a set-off against the verdict the deponent might ultimately obtain.

After some struggle by *Hamilton*, on the part of *Lyle*, to discriminate the two suits, the court was pleased to order the arguments to set aside the several reports to come on together.

*Hamilton*, for *Lyle*, after stating the circumstances, and commenting on them, and the affidavits of *Clason* and *Gardner*, observed, that it was very singular *Gardner*, without any knowledge of the contract of *Delard, Swan & Co.* with the *French* republic, or of *Lyle's* intent, should deliver exactly under that contract, and write a letter acknowledging the very interest *Lyle* claimed under it, and that *Clason* should pay him what he was thus entitled to. *Gardner*, without knowing the contract, goes further; he asks *Delard & Co.* if the *French* government will be punctual in paying, and *this*, he adds, *Clason* desired him to inquire about. *Clason* too, ratifies the engagement of *Delard & Co.* and *Gardner*, with *Lyle*, by adjusting the account with *Delard & Co.* and receiving under that account the two-thirds, by the very express terms of it, charged with the payment of the two-thirds of *Lyle's* fifth. To argue on the assertions of *Gardner*, would be really superfluous. The referees must have thought *Gardner* had no right to bind *Clason*. This idea is clearly repugnant

to every principle of law. He that entrusts another with general powers, must abide the result of his agent's conduct. Therefore, though the report in favour of *Lyle*, may and ought to stand, that in favour of *Clason* ought to be set aside.

*Hopkins* and *Troup*, contra. In making the reports in these causes, the referees were actuated by a wish to make the parties even, and leave them just as they were found. For this purpose, the report in our cause, was intended as a set-off to the other, and to effect this object, counsel were desired to frame the reports in such a manner as might best obtain the desired end. The various facts appear in the affidavits before the court ; but it is material to state, that the party who first made the application to disturb these reports, has not presented any original agreement, on which his suit is founded. *Delard, Swan & Co.* made a contract with the *French* government, for a certain quantity of pot and pearl-ashes : as these articles enter into the composition of gunpowder, it was necessary to have a neutral name in the business. It is difficult to say, what ought to be the true relative compensation for the protection a neutral character would afford ; but it is to be observed, that *Delard & Co.* were the real contractors ; *Lyle* a mere *nominis umbra :* for this, however, he says he is to have one full fifth, one-third of it to be paid by *Delard, Swan & Co.* the other two-thirds by *Clason.*— These terms, it is alleged, were stipulated by a formal contract, yet this contract, which *Lyle* must have had, is never produced ; on the contrary, instead of relying upon it, he rests on a letter received from *Gardner.* In addition to the inference to be

drawn from this fact, it appears, that at the very
time when this pretended contract was made, *Lyle*
was in *Europe,* under an annual allowance from *Cla-
son,* and actually his salaried agent, receiving wages
for every service performed. A doubt has been en-
tertained, how far the court can, under the existing
circumstances, with propriety set aside the report in
favour of *Clason:* but, surely, whenever they clear-
ly perceive that the referees have proceeded on a mis-
take, either of law or fact, this tribunal will always
interfere. If the court will set aside an award, they
will, on the same principles, vacate a report ; and,
whatever argument will induce them to do it in one of
the now causes, will have equal force in the other ;
for if the referees have been mistaken in their endea-
vours to create mutual set-offs, both reports will be
set aside ; or, on the other hand, if they have acted
properly, both will be confirmed ; for the court will
not, unnecessarily, do away what the referees have
done. In making their determination, they consi-
dered that the power to sell, and the power to give
away profits, were two things : to this latter, it can-
not be contended, that the authority of an agent or a
factor can extend. There is no question about an
agent's right over the property passed to him, but he
cannot enter into collateral engagements : he may
sell and warrant a title ; but not give away the pro-
perty. If he may, in any degree, do this, he may
go on indefinitely, and make away with the whole.
He may go on making contracts ruinous to his em-
ployer, and contrary to the purposes of his delega-
tion. Under a power to sell, if he should be allowed
even to exchange, can he be authorised to pay a dif-
ference ? The boundary of his power to bind, must

be connected with that of his authority to sell; it must
be confined to that, and will not warrant him to give away profits ; to pay another sum of money on another account than that of the sale. The point turns on whether *Gardner* had a competent authority to bind *Clason*, to pay two-thirds of a fifth of the profits. It was derived from the letter of instructions. That letter delegates only a general power. From the exercise of such a power, the claim cannot be supposed. That a factor may sell by a broker, and give a commission, if customary, is not contested ; but it is contested, that a factor or agent, having only a general authority to sell, can give away a substantive part of the merchandize when it was sold ; that he can do so, there is not a *dictum* in the books. It would be, in fact, to enable him to dispose of a portion of the property he is entrusted to vend. It would give rise to the most serious consequences ; a fraudulent collusion would completely destroy the interests of the principal, by enabling to constitute a sale regular in its form, the precise mode of which, could not be easily foreseen. The intention of *Clason's* agent must be taken into consideration, and the motives on which he proceeded, permitted to explain how he meant to bind his principal. *Gardner* never knew what the gratification to be paid *Lyle* actually was. The inducement he had to consent to any, was, that he deemed the amount immaterial ; for as *Lyle* was in the service of *Clason*, at a fixed salary, *Gardner* naturally concluded all *Lyle's* labour would accrue to *Clason*. On the principles of natural justice, the demand cannot be substantiated. He lends his name to *Delard*, it being necessary to make use of a

K k

Aug. Term,
1803.
neuter. The *douceur* must certainly be according to the situation of the party. The letter to *Clason,* containing the terms of the contract, does not state the sum to be paid. It is obvious, therefore, that this was never intended. It was considered as too trifling to specify.

*Gardner* knew, when he left *America,* that *Lyle* was a salaried agent. This is not a case of good faith between an agent, and a person totally a stranger, and, therefore, the principal called on to pay ; but we are called upon, on the strength of a little memorandum touched into the foot of an account. It is not to be forgotten that the referees were merchants, and well knew the course of trade and business, when the transactions took place, as well as the rights of an agent at a fixed annual allowance. The claim too, goes by the express name of a gratification ; and who ever heard of a partnership share (which this in fact is) ever being known by the appellation of a gratification ? When was 600*l.* sterling ever considered as a gratification for a person at a salary of 150*l.* per annum, *New-York* currency ? The referees might, therefore, have justly ejected the claim. No inference can be drawn from *Gardner's* letter, speaking of a contract : he might have sailed on another. But it was not the mere matter of the contract that was referred ; subsequent matters were added, not included in the two causes : this was by agreement of the parties, and how can the court say the full claim on the contract has not been allowed, when it might have been counterbalanced by damages and misconduct in the matter of the *Hare ?* This, therefore, being an application to the equitable jurisdiction of the

Aug. Term, 1803.

court, they will so mould and blend the two causes as will best answer the ends of justice; and, if in the suit by *Lyle,* the report be set aside, the court will do it on terms, and vacate the report in that against him.

*Clason* declares he never heard what *Lyle's* compensation was, till after the suit was brought. But can the court say, this particular claim ought not to be disallowed? After the rules to refer, other matters were added and blended; all contracts, " *express or* " *implied,*" were submitted. It cannot be said, there were not other claims to extinguish this demand of two-thirds of the fifth. It might have been admitted, and liquidated by a counter claim. Referees and arbitrators may so consider the subject matter before them, as will best answer the ends of justice : they may take into view matters both of law and of fact ; perform the offices of judges and jurors, and are entitled to found their decision either on law, or principles of general equity. The whole of this was delegated to them, and they have determined, on a view of all matters in controversy blended together in one mass, all the objects in these two causes, even in that against both the *Lyles,* as consolidated before them. Whether they have been perfectly accurate in thus beholding them, is immaterial, if they did so consider them, have acted under that idea, and have attained the real ends of justice, though, perhaps, by extraordinary means. It was evidently the wish of the parties to set all controversies between them fully at rest, and this has been accomplished. The court, therefore, will never say, that one report shall be confirmed, and the other set aside. The consideration

of the report in the suit *by Clason*, might have influ-
enced in the making up *that*, in the action against
him.    That it did so, is evident, because the reports
were intended as mutual set-offs.  Whether this could
be supported on strict legal reasoning, had been
doubted :  but the spirit of the case in 8 *D.* & *E.*
might, perhaps, fully warrant the conduct of the re-
ferees.    It may be a question, also, how far *Gardner*
could give such an interest, as might, perhaps, create
a partnership between *Lyle* and *Clason.*

*Harison* and *Hamilton*, in reply.  If, in cases of full
and fair investigation before juries, this court will in-
terpose, when a verdict has been rendered on an evi-
dent mistake of the law, they certainly will do so in
the case of a report made by referees, however ap-
pointed.    That this reasoning applies to the suit of
*Lyle* v. *Clason* is manifest, and it will, therefore, be
sent for further examination.  With respect to the
contract made between *Lyle*, and *Gardner*, the agent
of *Clason*, it is for the court to determine whether it
be obligatory or not.    The affidavits on the part of
*Clason*, do not state that he was ignorant of the con-
tract with the *French* government, but of the claim
of *Lyle*.    It appears from *Lyle's* deposition, and is
not controverted, that in *March*, 1794, letters were
written by *Lyle* and *Swan*, informing *Clason* of the
contract ; of *Lyle's* right, and that he *( Clason )* might
share, if he thought proper.    The letters were pro-
duced, and that they were received, *Clason's* con-
science would not let him negative.    There was a
stipulation to compensate, with a share of the actual
profits, for the use of the neutral name of *Lyle ;* when
these profits were ascertained, the right of *Lyle* at-

Aug. Term, 1803.

tached. There is, to be sure, no express recognition by *Clason* of the contract, but in the *September* following the date of *Lyle's* letter, *Gardner* arrives in *France* with exactly such a cargo as the contract demanded. Are there not circumstances enough, to think he went there for the purpose of acting under it ? But even allowing there are not, does not the letter of instructions substitute *Gardner* as owner of the property he carried, and invest him with all *Clason's* power over it ? He is to exercise his judgment ; do his best ; sell for *French* brandy ; sell to the *French* government, &c. he had, therefore, a right to make any contract under the words of the letter. He arrives in *France* with a power to dispose; he finds *Delard* possessed of a contract, in the name of *Lyle*, under which, the power to dispose may be exercised with great advantage. He does exercise it, receives the emolument, settles with *Delard & Co.* but refuses to do so with us. The inquiry then is, had *Gardner* a power, and has he exercised it ? That he had and has, no doubt can be entertained ; and as little, that it was under our contract ; for the affidavit subsequently made by *Gardner*, does not deny, but admits the fact. He says, however, that he knew not what the gratification was : this is extraordinary : he seems to have forgotten his own letter after a very few months ; and though that does not specify the exact sum, the two-thirds for which he mentions *Clason* is to settle, it affords an internal evidence that he did know it, much stronger than his own assertion to the contrary. *Gardner's* letter of the 7th *December*, 1794, particularizes two-thirds, and gives an account of the sales. Allowing, however, *Gardner* not to be apprised of the

exact sum, as *Lyle's* right was ascertained and per-
fected under the contract to which *Gardner* consent-
ed, acceding to the payment of two-thirds by *Clason*,
it follows *Clason* must be bound.    The rule is, that
he who places confidence, shall suffer by the abuse of
that confidence; *Clason*, therefore, and not *Lyle*, is to
be the loser by *Gardner's* actions.    It is extraordina-
ry that *Clason* should have remained ignorant of the
amount of *Lyle's* claim, four years after *Gardner's* re-
turn and rendering an account of his transactions.    If
*Gardner* then, having an authority to bind *Clason*, did
so, and *Clason* has received the benefit of that trans-
action, *Lyle's* right is perfect.    The assertion of his
being a salaried agent, does not affect the claim.    His
time of service expired in *September*.    Beyond that,
*Clason* himself, allows no salary, and *Gardner's* letter
is dated in *December*.    *Gardner* himself acknowledges
*Lyle's* right, by telling *Delard* to pay one-third of it.
Had it been otherwise, *Gardner* would have said,
you are not to pay the third of the fifth to *Lyle*, but
to *Clason*, for whose benefit *Lyle* is acting.    There is
a further proof in the letter to *Lyle*.    *Gardner* there
says, " *Mr. Clason is to settle with you* for two-
" thirds."    Here then is a clear established right in
*Lyle* to receive from *Clason*, two-thirds of the fifth of
the whole profits.    If so, the arbitrators have been
guilty of a mistake, in point of law, in considering
*Gardner* unauthorised to bind *Clason*, and this the
court will assuredly set right.    There is also another
ground on which they have clearly erred; for if they
have blended the reports in the two causes, or made
one enter into the composition of the other, they are
manifestly wrong.    There is no evidence of any thing

against *Lyle's* right, but the demands in the cause against him and his brother. Though both causes were referred, the referees have not any right to blend matter extraneous to the respective suit. *Robert Lyle's* action is for his own separate account. That of *Clason* against *Robert* and *John Lyle*, is against the partnership, and the one cannot be set off against the other, being in different rights. This is very wide from the case of a surviving partner, where the rights and duties centre in one person. The agreement does not alter this, for it was merely to allow of such matters as were admissible against the same parties, though not specifically proceeded for; to settle all disputes for which actions might be instituted against the respective defendants; to allow of damages arising from breach of contracts, express or implied, by the *Lyles*, to be settled under the reference of the suit against them, in which counts were used not applicable to actions of damages, but never to permit one suit to be set off against the other, or make *Robert Lyle* give up the benefit of his claim against *Clason*. They did not even take it into consideration, as they considered it not due; the report, therefore, in favour of *Robert* and *John Lyle*, may well be suffered to remain, and that in favour of *Clason* be set aside; for the amount of the profits claimed from him not being taken into consideration in the accounts by the referees, now remain unsettled. If, therefore, without including this demand, *Clason* has not any demand against *Robert* and *John Lyle*, the report does not prevent *Robert* from having a demand against *Clason*. Besides, it is evident the contract must have been known to *Clason* and *Gardner*, by the latter's express-

ing an intention of returning with the residue. The not mentioning it in the letter of instructions, was to avoid the risk of capture and condemnation; fates that were sure to attend a cargo of a contraband nature, going under an avowed contract with the *French* government. The receipt by *Clason*, of the proceeds of the cargo, is a ratification of every contract under which it was made, and no disavowal of *Gardner's* authority can be permitted. *Clason* enjoys the benefit, and if any charges do accompany the agreement, it is to be taken *cum onere.* The allowance of the account by *Delard, Swan, & Co.* is conclusive on the terms.

Lewis, C. J. delivered the judgment of the court. These actions were referred under rules of court to three referees, who have reported in each against the respective plaintiffs, declaring nothing due on either side. Motions are now made to set aside the several awards.

In the first cause, in which *Lyle* is plaintiff, the application is founded on a presumption that the referees have been mistaken in point of law. That they have either rejected a contract entered into by the defendant's ship-master and consignee, as not obligatory on his principal, or have set off the balances found for the plaintiffs, in the respective causes against each other.

To this the defendant answers, that he was not bound by the engagement of his ship-master, who was also his consignee, and that if the referees have

made such off-set, they were justified on principles of 'aw, and by an agreement entered into between the respective attornies.

As far as the facts can be collected from affidavits and documents furnished the court, they are these : That the *Lyles* being engaged in business in *France*, were charged with some commercial concerns of *Clason*, on which he claims a balance of account, and on which they deny any thing to be due. That *Robert Lyle,* while in *France*, was employed by the house of *Delard, Swan & Co.* there established in business to negotiate a contract, for the supply of certain quantities of pot and pearl-ashes to the *French* government, which he effected, and for which they were to allow him one-fifth of the profits. That the company, as well as *Robert Lyle*, wrote to Mr. *Clason* in *March*, 1794, acquainting him with their contract, and proposing to him to make shipments thereon. That in *September*, a vessel called the *Joseph*, belonging to the plaintiff, arrived in *France* loaded with ashes, consigned to *Gideon Gardner*, the master, who had general instructions to sell to the government, or to individuals, at his election. That *Gardner*, after making inquiries as to the government's punctuality, agrees with *Delard, Swan & Co.* to turn in his cargo under their contract, which is accordingly done, and neats a profit of £6,800 11 8 sterling; whereof *Clason* received two-thirds in consideration of his having made the advances, and the house of *Delard, Swan & Co.* one-third. On the adjustment of this account, it appears that the company and *Clason* were to account to *Robert Lyle* for his one-fifth, according

L l

to the proportions of profits by them respectively re-
ceived.

Captain *Gardner's* powers being discretionary, he
was perfectly justifiable in making the disposition he
did of the cargo entrusted to him, and even if he was
not, it does not appear that Mr. *Clason* ever denied
that transaction his sanction, but that on the contrary,
he has received by remittances to *Bird, Savage &
Bird,* of *London,* the proceeds of the cargo, including
his proportion of the profits. Under these circum-
stances, there can be no doubt that Captain *Gardner,*
having turned in his cargo under the contract, bound
Mr. *Clason* to the fulfilment of the terms of that con-
tract; and the latter, having received the full two-
thirds of the profits of the adventure, under the sti-
pulation made by his agent, that he should account to
*Lyle* for two-thirds of his *douceur,* or whatever else
it may be called, (for names will not alter the essen-
tial quality of the thing) he is bound to perform such
stipulation.

If, therefore, the referees have not admitted this
claim, they have erred as to the law, and the award
ought to be set aside.

If, on the contrary, they have admitted it, then
they must have allowed a balance found due to *Cla-
son* in the other suit, as a set-off against it. This also
is incorrect; for the suits are not between the same
parties, and the partnership funds should have been
first appropriated to the discharge of the partnership
debts. The agreement between the attornies, does
not authorise such set-off. Its only object, is the ad-

:nission of certain demands which would not fall
within any of the counts in the respective declarations,
in order to avoid further litigation.

The award, therefore, in each suit, ought, in my
opinion, to be set aside.   The one against *Clason,*
for the reasons above mentioned, and the one in
which he is plaintiff, because there is a probability
that the referees found a balance there due to him,
which he would otherwise lose the benefit of.   The
judgment of the court is, that both awards be set
aside.